UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Case No. 21-cr-114-1 |
| | ) | |
| ERIC CORDER, | ) | Hon. Steven C. Seeger |
| _____ | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

The FBI received tips from multiple informants that Defendant Eric Corder was engaging in narcotics and sex trafficking activities out of his residence in the south side of Chicago. So it began to investigate.

Law enforcement agents conducted surveillance and amassed a pile of evidence against Corder, including two controlled buys and several witness interviews. They put that information into a warrant application and received two warrants to search Corder's residence. A grand jury ultimately indicted Corder on narcotics possession and distribution charges based in part on the evidence recovered executing the warrants.

Corder now challenges the validity of the warrants. He takes issue with the truth of certain statements contained in affidavits submitted in support of them, and he moves to suppress the evidence and moves for an evidentiary hearing under *Franks v. Delaware*, 438 U.S. 154 (1978). For the reasons set forth below, Corder's motion (Dckt. No. 42) is denied.

**Background**

Defendant Eric Corder is charged with one count of distributing narcotics, and one count of possession of narcotics with intent to distribute, both in violation of 21 U.S.C. § 841(a)(1). *See* Indictment, at 1–2 (Dckt. No. 11). Leading up to the arrest, law enforcement applied for,

obtained, and executed two search warrants for Corder's residence. *See* Gov't Resp., at 6 (Dckt. No. 45). Corder now argues that items seized during the search should be suppressed pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), because the search warrant applications allegedly contained false statements and omitted material information necessary to the magistrate judge's finding of probable cause.

The investigation into Corder began in February 2019, after a confidential informant ("CS1") reported that Corder was selling narcotics in the general vicinity of his residence in the south side of Chicago. *See* Search Warrant Application 21M86 ("Warrant Application 1"), at ¶ 5 (Dckt. No. 46). A few months later, in November 2020, the FBI received more information from another confidential informant ("CS2") that Corder was in possession of and distributing narcotics from that same residence. *See* Cplt., at ¶ 5 (Dckt. No. 1). That informant also reported that Corder kept several women in the detached garage of the property for the purpose of commercial sex trafficking. *See* Warrant Application 1, at ¶ 6 (Dckt. No. 46).

At the time, Corder shared the residence with his sister. *See* Pretrial Bail Report, at 1 (Dckt. No. 7). But he and his sister had divided the residence, and Corder lived in the basement, where his bedroom was. *See* Search Warrant Application 21M87 ("Warrant Application 2"), at ¶ 6 (Dckt. No. 47). His sister went to the basement only to do laundry or to access the freezer. *Id.*

CS2 told police about how Corder's narcotics operation worked. Corder would first receive a call for narcotics on his cellphone. *See* Cplt., at ¶ 6 (Dckt. No. 1). Then, after Corder received the call, he would instruct the caller to go to the basement window, or to the detached garage on the property, where he would meet them. *Id.*

CS2 knew this information because he had been inside Corder's house somewhere between twenty and thirty times over the previous two years. *Id.* During those visits, he had seen Corder receive calls for narcotics, and had witnessed Corder making, mixing, and packaging drugs for individuals inside of the basement. *Id.* He had also personally called on Corder before by knocking on the basement window. *Id.*

During one visit to Corder's house in late November 2020, CS2 had observed what he believed to be a plate of narcotics in the basement. *Id.* He also observed the handle of a firearm underneath a pillow in the basement. *Id.*

With this information in hand, law enforcement collaborated with CS2 to set up two controlled buys – meaning staged drug transactions in which CS2 purchased narcotics from Corder – all under police surveillance. Law enforcement collected audio and video recordings of each.

The first controlled buy took place on December 1, 2020. *Id.* at ¶ 7. Although he had arranged the buy outside of the presence of law enforcement, CS2 met with FBI and other law enforcement agents before encountering Corder. *Id.* at ¶¶ 3, 7. Officers then searched CS2 for contraband, provided him with $500 to purchase narcotics, and equipped him with an audio and video recording device to document the transaction. *Id.* at ¶ 7. Agents also set up visual surveillance of Corder's residence. *Id.*

From there, CS2 called Corder while still in the presence of law enforcement. *Id.* at ¶ 8. The two discussed that CS2 was nearby Corder's residence and would be walking up shortly. *Id.*

Under the surveillance of police, CS2 walked over to Corder's residence and entered the side gate to wait for Corder in the backyard. *Id.* at ¶ 9. Corder showed up a few minutes later in

3

a car, at which point CS2 walked out from behind the residence to meet him in the middle of the street. *Id.* at ¶ 10.

The recording device captured the ensuing conversation. Corder told the informant, "I'm finna put some more together. . . . See you had called." *Id.* CS2 responded, "[g]ive it all to me." *Id.* Corder replied that he had to "hit a couple of people, man. Take me about thirty minutes. I don't know if you need enough time or not." *Id.* The informant told Corder, "I'm all good. Aight cuz." *Id.* The two then parted ways. *Id.*

When CS2 met with law enforcement following the exchange, he handed an FBI Special Agent twelve clear baggies of a tan powdery substance suspected to be heroin and $400 in unused funds. *Id.* at ¶ 11. The total weight of the substance, which ultimately tested positive for the presence of fentanyl and heroin, was 7.2 grams. *Id.* at ¶¶ 11–12.

The investigation didn't stop there. Law enforcement arranged a second controlled buy between CS2 and Corder two weeks later, on December 15, 2020. *Id.* at ¶ 13. Like the first controlled buy, officers set up surveillance around the Corder residence, searched CS2, equipped him with an audio and video recording device, and provided him with $500 to complete the transaction. *Id.*

Instead of meeting in the street, this time CS2 knocked on Corder's basement window and met him at the door of the detached garage. *Id.* at ¶ 14. The two individuals then entered the garage and spoke for about ten minutes. *Id.* The video and audio recording captured the conversation that followed:

CS2: "You want the Sauce?"

Corder: "Yeah."

CS2: "You want the hundred?"

4

Corder: "I want the whole hundred."

*Id.* The audio recording then contains the sound of what the complaint describes as money being counted, then:

CS2: "Five of 'em."

Corder: "Five hard?"

CS2: "Yeah."

*Id.*

CS2 and Corder engaged in conversation for approximately ten more minutes. *See* Warrant Application 1, at ¶ 20 (Dckt. No. 46). At some point during the exchange, Corder began to complain to CS2 about a woman living in Corder's detached garage who owed him money. *Id.* Corder stated:

> I was gonna call to give it to you. . . . She gon' work now. . . . I done put you[] out here 10 times you keep coming back, no this time take your [stuff] with you . . . . I'm really not making money off you, I spend [unintelligible]. I feed you, I house you, then the money I do make they don't even pay me I gotta work days on [unintelligible]. You owe me some damn money from the other day. Wake up tell me I'm not goin' keep goin', she can get to steppin' . . . Tell me this how this go, no this ain't how this go, Imma let you lure me into this . . . . They owe me money I gotta wait on you today for my money. I gotta wait eight days to get my money, you can't work thirty minutes but I gotta wait eight days. See what it like to wake up sick. [laughter]

*Id.*

Special Agent James Underwood, the officer who prepared the warrant affidavit, stated that he believed this conversation referred to a woman whom Corder was trafficking sexually. *Id.* at ¶ 21. He further explained that the phrase "waking up sick" referred to the drug withdrawal symptoms that the woman would experience if Corder were to cut off her supply of narcotics. *Id.*

Corder went on to complain:

5

I'm out here texting her, I'm like look don't fall in love with me, don't shoot that [] no more then I gotta put her in her feelings, I'm like look don't call me woowoo don't shoot that [] no more. Don't knock on the window, if I lock the window that mean nothing happening. . . . You called, I said no, keep calling keep calling, night here come to the window knockin' . . . c'mon man I can't get no sleep. . . . Cause I be up all night on [unintelligible] program, so then I gotta stay up all night servin' yo ass, then I gotta get these people. . . . Let me know where these [guys] is? You don't know. Tell me where T lives? You don't know. Well then fine then, go stay in his garage, tell him to bring you something to eat. What's the matter? You staying with me you getting this back and you owe me. You wanna run it up a hundred dollars and now you want to keep coming up short?

*Id.* at ¶¶ 21, 25. In the warrant application, Agent Underwood explained that Corder was complaining that the woman was knocking on his basement window throughout the night to receive drugs, and that she owed him money. *Id.* at ¶¶ 23, 27.

After the conversation, CS2 left the garage and returned to law enforcement agents. *See* Cplt., at ¶ 16 (Dckt. No. 1). He handed them 14.3 grams of a tan powdery substance suspected to be heroin and 1.5 grams of a white, rock-like substance suspected to be crack cocaine. Tests later confirmed that the substances were a fentanyl-laced heroin and cocaine. *Id.*

At that point, law enforcement began to further investigate the potential sex trafficking activity. Officers contacted Individual A, a longtime sex worker in the area, who informed them that she knew of an individual named "Outlaw" – allegedly Corder's nickname – who was a high-ranking drug dealer who typically laced his heroin with fentanyl. *See* Warrant Application 1, at ¶¶ 30–31 (Dckt. No. 46). She also reported that she had purchased heroin from "Outlaw" just days before, inside of the detached garage at Outlaw's residence. *Id.* at ¶ 31. And while inside, she saw three women – Victim 1, Victim 2, and Victim 4. *Id.* She believed that Outlaw housed the women in his garage for prostitution. *Id.*

Meanwhile, in the weeks after the second controlled buy, CS2 reported to law enforcement that he had encountered a woman, Victim 1, walking nearby Corder's residence. *Id.*

6

at ¶ 29. Victim 1 was apparently missing several front teeth. *Id.* She told CS2 that Corder physically assaulted her after he learned that she had tried to keep some money from one of her commercial sex appointments from him. *Id.* She also told CS2 that Corder had taken her phone away when she did not answer his calls while she was on a "date." *Id.*

Finally, on January 14, 2021, law enforcement set up video surveillance of the alleyway behind Corder's residence and the detached garage. *See* Warrant Application 1, at ¶ 32 (Dckt. No. 46). That surveillance picked up the coming and going of several individuals. For example, in the early morning hours of January 15, an unknown male and Corder walked from Corder's residence through the backyard and exited the fence next to the detached garage. *Id.* In the alley, the two engaged in an apparent narcotics transaction. *Id.*

Later that morning, another individual, a suspected sex trafficking victim, walked through the alleyway and entered the back gate next to the detached garage. *Id.* An unknown male then approached the garage and knocked on the door. *Id.* A female exited the back gate and walked down the alleyway with the unknown male. *Id.*

With all this information in hand – the tips, the controlled buys, police observations, and the video surveillance – the FBI applied for and executed two search warrants at Corder's residence on February 17, 2021. *See* Gov't Resp., at 6 (Dckt. No. 45); Warrant Application 1 (Dckt. No. 46); Warrant Application 2 (Dckt. No. 47).

The first warrant was for Corder's residence and detached garage. *See* Gov't Resp., at 6; Warrant Application 1 (Dckt. No. 46). Corder was present during the execution of this warrant. *See* Gov't Resp., at 6 (Dckt. No. 45).

In executing the first warrant, law enforcement recovered a loaded firearm and suspected narcotics from inside of the basement of Corder's residence. *See* Warrant Application 2, at ¶ 8

(Dckt. No. 47). The narcotics, found in a bookbag, were packaged similarly to those that Corder had distributed to CS2 just a few months earlier. *See* Gov't Resp., at 6 (Dckt. No. 45). The firearm was a Glock 17, which law enforcement found next to a loaded extended magazine. *See* Warrant Application 2, at ¶ 8.

The second warrant came not long after. Law enforcement applied for and obtained the second search warrant, which specifically sought recovery of electronics in the residence, that same day. *Id.* at ¶ 1; Gov't Resp., at 6 (Dckt. No. 45). Pursuant to this warrant, law enforcement seized approximately five cell phones, a laptop, two tablets, a SIM card, and two memory cards. *See* Gov't Resp., at 6.

On February 17, 2021, Corder was charged by complaint with distribution of narcotics, in violation of 21 U.S.C. § 841(a). *See* Cplt., at 1 (Dckt. No. 1). And on March 16, 2021, a grand jury returned an indictment charging Corder with one count of distributing narcotics on December 15, 2021, and one count of possession of narcotics with intent to distribute them on February 17, 2021, both in violation of 21 U.S.C. § 841(a)(1). *See* Indictment, at 1–2 (Dckt. No. 11).

Corder then filed a series of motions to suppress, along with a motion for a *Franks* hearing. (Dckt. Nos. 35, 40, 42, 53). The Court now considers Corder's motion for a *Franks* hearing (Dckt. No. 42). For the reasons that follow, that motion is denied.

### Legal Standard

A criminal defendant is entitled to a *Franks* hearing – "an evidentiary hearing regarding the veracity of information included in a search warrant application" – in certain circumstances. *Franks*, 438 U.S. 155–56. However, "[a]ffidavits and complaints supporting warrants are presumed to be valid." *United States v. Johnson*, 580 F.3d 666, 670 (7th Cir. 2009). Thus, to be

entitled to a *Franks* hearing, a defendant must make a "substantial preliminary showing that (1) the warrant affidavit contained false statements, (2) these false statements were made intentionally or with reckless disregard for the truth, and (3) the false statements were material to the finding of probable cause." *United States v. Hancock*, 844 F.3d 702, 708 (7th Cir. 2016) (quoting *United States v. Mullins*, 803 F.3d 858, 861–62 (7th Cir. 2015)).

As the Seventh Circuit has repeatedly stated, "[b]ecause these elements are hard to prove, *Franks* hearings are rarely required." *United States v. Slizewski*, 809 F.3d 382, 384 (7th Cir. 2016); *see also Johnson*, 580 F.3d at 670 ("This burden is substantial, and *Franks* hearings are rarely required."); *United States v. McMurtrey*, 704 F.3d 502, 511 (7th Cir. 2013) ("It is not easy for a defendant to make the required preliminary showing under *Franks*.").

Under the first prong, "[c]onclusory, self-serving statements are not enough to obtain a *Franks* hearing." *Johnson*, 580 F.3d at 671; *see also United States v. Reed*, 726 F.2d 339, 342 (7th Cir. 1984) ("[T]he Franks presumption of validity of an affidavit supporting a search warrant cannot be overcome by a self-serving statement which purports to refute the affidavit.").

Rather, to obtain a hearing, a defendant must "offer direct evidence of [the affiant's] state of mind or circumstantial evidence that [he] had a subjective intent to deceive based on the nature of [his] omissions." *United States v. Clark*, 935 F.3d 558, 565 (7th Cir. 2019) (quoting *United States v. Glover*, 755 F.3d 811, 820 (7th Cir. 2014)). "The defendant must identify specific portions of the warrant affidavit as intentional or reckless misrepresentations, and the claim of falsity should be substantiated by the sworn statements of witnesses." *McMurtrey*, 704 F.3d at 508 (citing *Franks*, 438 U.S. at 171).

Under the second prong, "[a]n affiant acts with reckless disregard for the truth when he 'in fact entertains[s] serious doubts as to the truth of his allegations.'" *United States v. Williams*,

718 F.3d 644, 650 (7th Cir. 2013) (cleaned up). "This is a subjective inquiry that focuses on the officer's state of mind. A showing of reckless disregard requires more than a showing of negligence and may be proved from circumstances showing obvious reasons for the affiant to doubt the truth of the allegations." *Id.*

Under the third prong, "[i]f probable cause to issue the warrant would still exist even if the false statement or material omission were corrected, then no *Franks* hearing is required." *United States v. Santiago*, 905 F.3d 1013, 1025 (7th Cir. 2018) (quoting *United States v. Carmel*, 548 F.3d 571, 577 (7th Cir. 2008)). "[A]n unimportant allegation, even if viewed as intentionally misleading, does not trigger the need for a *Franks* hearing." *United States v. Swanson*, 210 F.3d 788, 790 (7th Cir. 2000). A hearing is only warranted if a defendant can show that the false statements or omissions were "necessary to find probable cause." *United States v. Schultz*, 586 F.3d 526, 531 (7th Cir. 2009).

### Analysis

Corder seeks to suppress the fruits of the search warrants on the grounds that the government included multiple misstatements and omitted key information from its supporting affidavits. He targets four misstatements and omissions: (1) he contends that the first controlled buy did not take place outside his residence, but at the Salvation Army down the block; (2) he argues that the affidavit omitted key facts relating to CS2's credibility as an informant; (3) he argues that the affidavit omitted key details from the second controlled buy; and (4) he argues that the affidavit omitted several exculpatory pieces of evidence relating to its allegations of human trafficking taking place on the residence. *See* Def.'s Am. Mtn. for *Franks* Hearing (Dckt. No. 64); Def.'s Am. Mtn. for *Franks* Hearing (Cont.) (Dckt. No. 64-1).

On these bases, Corder insists that he is entitled to a *Franks* hearing to prove that "false and material information has been included and or omitted; and that once stricken the affidavits in the warrants fail to establish probable [cause]." *See* Def.'s Am. Mtn. for *Franks* Hearing (Cont.), at 26 (Dckt. No. 64-1). The Court addresses each argument turn.

## I.    Location of the First Controlled Buy

Corder asserts that the first warrant affidavit misrepresented the location of the December 1, 2020 controlled buy. He insists that the buy happened at the Salvation Army down the block, not "in front of the subject residence" as the affidavit claims. *See* Def.'s Am. Mtn. for *Franks* Hearing, at 8 (Dckt. No. 64); Warrant Application 1, at ¶ 13 (Dckt. No. 46).

As proof, Corder points to the audio recording of the transaction. That recording suggests that he and CS2 planned – that's a key word – to meet at the Salvation Army, about 476 feet away from Corder's residence. *See* Def.'s Am. Mtn. for *Franks* Hearing, at 8 (Dckt. No. 64) ("[CS2] states 'Hey is it cool I sit on your back porch by the garage[?]' Defendant responds 'No . . . . Go to the Salvation Army.'"); Gov't Resp., at 19 n.8 (Dckt. No. 45).

As Corder sees it, "[t]here is not one shred of evidence that at any time defendants [sic] residence was the designated meeting location. The contemporaneous audio recordings between the parties is the only clear objective evidence of the designated meeting locations." *See* Def.'s Am. Mtn. for *Franks* Hearing,  at 10 (Dckt. No. 64).

This allegedly false statement does warrant a *Franks* hearing. Corder fails at prong two. He does not provide an evidentiary basis for his contention that the affiant intentionally misrepresented the location of the buy on the search warrant application.

Corder argues that the affiant, Agent Underwood, acknowledged that he listened to the audio recording of the encounter. That recording, in Corder's view, clearly demonstrates that the

"designated meeting location" was the Salvation Army, not Corder's residence. *Id.* at 15. Agent Underwood could not have heard the recording and ignored where the two planned to meet.

But these conclusory statements about what Agent Underwood should have inferred from the exchange do not overcome the presumption of validity of his affidavit or otherwise justify a *Franks* hearing. *See Souffront*, 338 F.3d at 822 ("The presumption of validity cannot be overcome by defendant's self-interested inferences and conclusory statements.").

Moreover, it is not clear to the Court that the affidavit contained any misrepresentation at all. At best, the audio evidence to which Corder points shows that he and CS2 *planned* on meeting outside of the Salvation Army. A plan to meet someplace does not guarantee that the two in fact met there, especially considering the fact that CS2 was already outside Corder's residence at the time of the phone call. Plans can change, and the recorded conversation does not directly refute what law enforcement stated they observed. *See Johnson*, 580 F.3d at 671 (no *Franks* hearing in part because there was "no evidence that [the affiant] was aware" of the inaccurate statements in the affidavit).

To the extent that the conversation about the Salvation Army was an omission, Corder fails to make the showing that the Seventh Circuit demands. "A *Franks* violation based on an omission requires a showing that the material information was omitted deliberately or recklessly to *mislead* the issuing magistrate." *Williams*, 718 F.3d at 650 (emphasis in original). This is so, the Seventh Circuit has explained, given the reality that "officers must always make deliberate decisions about what to include in and omit from a warrant application." *Id.* Corder "must offer direct evidence of the affiant's state of mind or inferential evidence that the affiant had obvious reasons for omitting facts in order to prove deliberate falsehood or reckless disregard." *United States v. Souffront*, 338 F.3d 809, 822 (7th Cir. 2003) (quotation marks and citation omitted);

*McMurtrey*, 704 F.3d at 513 ("The police need not provide every detail of an investigation, nor describe every wrong turn or dead end they pursued. But they may not *deliberately* omit information the magistrate needs to assess fairly the issue of probable cause.") (emphasis added).

Here, nothing in Corder's motion shows that Agent Underwood "entertain[ed] serious doubts as to the truth of his allegations" when it represented that the transaction occurred outside of the residence. *Williams*, 78 F.3d at 650 (quoting *United States v. Lowe*, 516 F.3d 589, 584 (7th Cir. 2008)). And Corder points to no evidence that Agent Underwood sought to mislead the magistrate judge by leaving out the discussion of the Salvation Army. He offers only the conclusory statement that the omission was "designed to give the impression that the meeting was arranged from inception to ending to occur at or in front of defendants [sic] residence." *See* Def.'s Am. Mtn. for *Franks* Hearing, at 15 (Dckt. No. 64). As the Court just discussed, such conclusory statements don't cut it.

Finally, the Court finds that Corder has failed at prong three. The alleged misstatement and omission would not have affected the probable cause determination. "[O]nce the errors were removed and the omitted material included, probable cause would have remain for a search warrant to issue." *Williams*, 718 F.3d at 646. The affidavit contained a wealth of other incriminating information.

For starters, a question about the precise location of the controlled buy does not negate, as Corder argues, the fact that a controlled buy took place. At the end of the day, law enforcement observed CS2 meet with Corder and return with 7.2 grams of heroin and $400 in unused buy funds. *Id.* at ¶ 14.

Relatedly, the discrepancy between the two accounts is minimal, and so the impact of its omission on the probable cause determination is similarly faint. The two locations are on the

13

same block, mere hundreds of feet apart. The fact that Corder arranged for the controlled buy to transpire down the block from his house does little to undermine the probable cause to believe that Corder was operating narcotics trafficking activities from his home.

And then, there is the abundance of other information in the affidavit suggesting that Corder was selling narcotics from his house. That evidence came from multiple confidential informants, police observation, as well as video and audio recordings.

For instance, CS2 told police that he had been inside Corder's house around thirty times over the past two years, and had seen narcotics and a firearm inside. *See* Warrant Application 1, at ¶ 7 (Dckt. No. 46). CS2 had also witnessed Corder tell individuals to meet him at the basement window or detached garage after Corder received a call for narcotics. *Id.* And on the night of January 30, he observed Corder making hand-to-hand transactions with individuals after Corder's phone rang. *Id.* at ¶ 34.

CS2 wasn't the only one. Earlier, CS1 had told police that Corder was selling narcotics in the general vicinity of his home. *Id.* at ¶ 5. Individual A corroborated that claim, describing Corder as a "high-ranking drug dealer" in the area who had once sold heroin to Individual A from his garage. *Id.* at ¶¶ 30–31. Three different people were all singing the same tune, and Agent Underwood put all of it into the affidavit.

There was also a second controlled buy. Corder does not dispute that the buy took place within the detached garage on his premises. *Id.* at ¶¶ 17–27. On that December 15 encounter, CS2 met Corder at his residence, went with him to the detached garage, and allegedly distributed heroin and cocaine to him. *Id.* Police surveillance as well as video and audio recordings corroborate the transaction. *Id.* at ¶ 19.

In sum, even if the December 1 controlled buy did transpire at the Salvation Army (and the Court is skeptical on that front), that fact does little to undermine the probable cause that Corder was selling narcotics out of his home. A *Franks* hearing is therefore unnecessary.

## II. Credibility of the Second Confidential Source

Corder next argues that the warrant affidavit overstated CS2's credibility. Specifically, he charges that the affidavit made a material omission by failing to include that CS2 admitted to using some of the drugs he purchased from Corder during one of the controlled buys. *See* Def.'s Am. Mtn. for *Franks* Hearing, at 22 (Dckt. No. 64). And because the government heard CS2 admit to Corder that he did some of the drugs, the government intentionally omitted that information from the warrant affidavit. *Id.* at 22.

This omission is not the substantial preliminary showing of falsity needed to justify a *Franks* hearing. Once more, the Court is not convinced that the evidence to which Corder points is sufficient to overcome the presumption in favor of an affidavit's truthfulness. *See Franks*, 438 U.S. at 171; *Reed*, 726 F.2d at 342. The omission does not move the ball for several reasons.

First, there is "a question as to whether Defendant's averments actually contradict the informant's statements." *United States v. Terrell*, 2016 WL 1270426, at *4 (N.D. Ill. 2016). Corder identifies an "admission" from CS2 that he "deceived the FBI," meaning that he took some of the drugs from the controlled buy. *Id.* at 23–24. As evidence, he points to audio from the second controlled buy in which CS2 told Corder, regarding the drugs he purchased during first controlled buy, "that shit decent too. I did one when I walked away, that shit had me gone." *Id.* at 22.

But context is key. CS2 made the supposed admission to Corder during the second controlled buy. It seems natural that an informant would tell his drug dealer that he tried some of

15

the drugs that Corder gave him. Was CS2 supposed to tell Corder that he had not done the drugs, and instead had marched the evidence over to police? If there's a lie here, the Court thinks it more likely that it was between CS2 and Corder, not the affiant and issuing judge. "The link between the allegations" and CS2's credibility "is a tenuous one," at best. *United States v. Vines*, 9 F.4th 500, 511 (7th Cir. 2021).

Second, and relatedly, Corder does not show that Agent Underwood omitted CS2's admission deliberately or recklessly to mislead the issuing magistrate judge. *See Hancock*, 844 F.3d at 708; *Williams*, 718 F.3d at 650. As Corder sees it, it was a no-brainer for Agent Underwood to include CS2's admission in the affidavit, because it directly undermined CS2's credibility as an informant. But again, Corder's argument required police to have assumed that CS2, whom they had surveilled throughout the entire transaction, was lying to them, and telling Corder the truth. An affiant "need not provide every detail of an investigation." *McMurtrey*, 704 F.3d at 514.

Third, Corder once more fails at prong three. Even if false, the Seventh Circuit has held that a *Franks* hearing is not required every time some substantial information about an informant's credibility is omitted from a probable cause affidavit. *See Clark*, 935 F.3d at 565 (citing *Hancock*, 844 F.3d at 709). "Although an omission of known and substantial adverse information about the informant's credibility is sufficient to support a reasonable inference of recklessness, the Seventh Circuit has disclaimed any sort of blanket rule that, for example, mandates a *Franks* hearing every time substantial adverse information about the informant's credibility is omitted from a probable cause affidavit." *United States v. Burke*, 2022 WL 1970189, at *65 (N.D. Ill. 2022) (cleaned up) (quoting *Glover*, 755 F.3d at 820; *Hancock*, 844 F.3d at 709).

Rather, the Seventh Circuit has "repeatedly recognized that misrepresentations or omissions that could impact the credibility assessment do not trigger a *Franks* hearing where probable cause is nevertheless established through other evidence." *Vines*, 9 F.4th at 511; *United States v. McDuffy*, 636 F.3d 361, 363 (7th Cir. 2011) ("[A]n omitted detail is 'material' only if its inclusion would upset a finding of probable cause."). Moreover, "when police have sufficiently corroborated an informant's tip, the omission of facts pertaining to the informant's credibility may not be material." *Clark*, 935 F.3d at 565.

Here, probable cause abounds. The affidavit articulated several corroborating sources, including audio and video recordings, police surveillance, and multiple controlled purchases of narcotics. *See* Warrant Application 1, at ¶ 6 n.3 (Dckt. No. 46). Probable cause here did not "hinge on the credibility" of CS2. *United States v. Bacon*, 991 F.3d 835, 842 (7th Cir. 2021) (describing the failure to disclose the fact that middlemen would be arrested as "immaterial" to credibility given that the affidavit already described them selling illegal drugs).

The affidavit also provided ample background about CS2 – a longtime credible and reliable informant – including the fact that CS2 had seven felony and misdemeanor convictions for forgery, drug use, firearms. *Id.* This disclosure is sufficient. *See Mullins*, 803 F.3d at 862 (7th Cir. 2015) (*Franks* hearing not required because, even eliminating false statements and incorporating omissions, probable cause existed given the level of detail in the statements and the corroborating evidence); *Hancock*, 844 F.3d at 710 (affirming denial of a *Franks* hearing where affidavit left out information about the informant's own criminal history).

For this reason, *Clark*, on which Corder relies, is readily distinguishable. Unlike here, the warrant application in that case "did not include *any* of the substantial adverse information" about the informant's credibility. *See Clark*, 935 F.3d at 565. Moreover, the court in that case

17

found that officer corroboration was "much weaker than in the cases where we upheld warrants' validity in the face of credibility omissions." *Id.* Crucially, the police there "had no controlled buys," and "never saw money or drugs change hands." *Id.* Not so here, where officers sent CS2 into a recorded, controlled buy after which he returned with drugs furnished by Corder. Corder's second argument therefore fails.

## III.    The Second Controlled Buy

Corder's third argument relates to the events leading up to the second controlled buy that took place on December 15, 2020. He alleges that law enforcement violated his Fourth Amendment rights in conducting the second controlled buy, and argues that the affidavit was "misleading because the issuing judge was misled into believing that he was considering legally obtained evidence," when in fact it was obtained in violation of his constitutional rights. *See* Def.'s Am. Mtn. for *Franks* Hearing (Cont.), at 11 (Dckt. No. 64-1). Without the evidence from this buy, Corder argues, "probable cause disappears." *Id.*

The Court disagrees. Even without the evidence from the December 15, 2020 controlled buy, "there remain[ed] sufficient content" in the affidavit to support "a finding of probable cause." *Franks*, 438 U.S. at 171–72. For starters, there is the evidence from the first controlled buy, in which Corder allegedly sold more than seven grams of heroin to CS2.

There is also the detailed accounts of three individuals – CS1, CS2 and Individual A – regarding the nature of Corder's drug trafficking operations that took place in and around his apartment. That information was consistent: each witness corroborated the others, and police surveillance and observations further corroborated their information.

Even putting the evidence of narcotics trafficking aside, an entirely separate basis for issuing the warrant remained. The warrant contained evidence from multiple sources suggesting

18

that Corder was engaged in sex trafficking activities out of his residence.  Probable cause as to this offense alone supported the warrant.

Indeed, nearly half of the warrant application describes evidence relating to sex trafficking activities taking place out of Corder's detached garage.  CS2 first informed police that Corder kept several women in the detached garage of the property for the purpose of commercial sex trafficking.  *See* Warrant Application 1, at ¶ 6 (Dckt. No. 46).  CS2 also relayed his encounter with Victim 1, in which Victim 1 reported that she was physically assaulted after she had tried to keep money from one of her commercial sex appointments.  *Id.* at ¶ 29.  And Individual A corroborated these allegations, telling police that she had seen three females inside Corder's garage, whom Corder housed there for prostitution.  *Id.* at ¶ 31.

Police surveillance backed up all of these accounts.  In January 2021, video surveillance observed various women entering and exiting the detached garage.  *Id.* at ¶¶ 29–33.

In sum, even if the Court disregards all of the events relating to the second controlled buy, probable cause – relating to both sex and narcotics trafficking activities – remained.  *See United States v. Spann*, 2021 WL 916083, at *5 (N.D. Ill. 2021) ("Probable cause exists when the totality of the circumstances reveals a reasonable probability of criminal activity.") (quoting *United States v. Jarding*, 2002 WL 1905533, at *3 (N.D. Ill. 2002)).

## IV.    False Statements and Omissions Related to Sex Trafficking

Finally, Corder argues that the affidavit made four false statements regarding the alleged sex trafficking activity.  He identifies the following false statements:  (1) "Corder kept several women in the detached garage where Corder would arrange commercial sex appointments for the women and provide them with illegal drugs in order to encourage them to engage in commercial sex acts," (2) "[t]here is probable cause to believe that Corder is housing women in the detached

19

garage at the subject residence who Corder is trafficking for commercial sex," (3) "CS2 identified Victim 1 as a woman who engages in commercial sex acts for Corder," and (4) "CS2 has positively identified Victim 1 and Victim 2 as women CS2 has seen living in the detached garage at the subject residence." *See* Def.'s Am. Mtn. for *Franks* Hearing (Cont.), at 12 (Dckt. No. 64-1).

These allegedly false statements do not warrant a *Franks* hearing. This section of Corder's amended motion generally questions the reliability of CS2 and Individual A, as well as what he views as the lack of corroboration of the sex trafficking tips. *Id.* at 14–21. But at the end of the day, Corder attempts to drag the Court into an argument that pieces of evidence in isolation do not give rise to probable cause. That's not how probable cause works.

The probable cause determination is not a piecemeal analysis. It takes into account the totality of the circumstances. *See Vines*, 9 F.4th at 510 ("Th[e] probable cause determination is a practical, common-sense one based upon the totality of the circumstances, and exists for a search warrant when those circumstances indicate even a fair probability that contraband or evidence of a crime will be found in a particular location.") (internal quotation marks omitted); *United States v. Parra*, 402 F.3d 752, 764 (7th Cir. 2005) ("So long as the totality of the circumstances, viewed in a common sense manner, reveals a probability or substantial chance of criminal activity on the suspect's part, probable cause exists."). As this Court has already discussed, the totality of the circumstances supported a finding of probable cause as to the sex trafficking crime alone, and certainly so when considering all of the allegations in the affidavit.

Finally, Corder identifies several allegedly material omissions from Victims 1 and 2 stating that Corder was not involved in human trafficking. *See* Def.'s Am. Mtn. for *Franks* Hearing (Cont.), at 13 (Dckt. No. 64-1). He notes that the affidavit omitted statements by Victim

20

1 that "Corder was not involved in human trafficking," and that she "kept the money she

earned." *Id.* He also points out that Victim 2 told the FBI that "Corder does not set up dates for

[Victim 2] and does not take any money she earns," and that Corder "never becomes violent"

with her. *Id.*

These alleged omissions do not warrant a *Franks* hearing, either. The alleged victims'

statements insisting that Corder was not engaged in criminal activity are not material to the

probable cause determination. Both Victims 1 and 2 had been previously arrested for narcotics

or commercial sex related offenses in the past several months. The interviews concerned alleged

sex trafficking in which they were involved. *See* Warrant Application 1, at ¶ 31 n.9 (Dckt. No.

46). "It is hardly surprising that an individual under investigation would try to downplay his

own involvement in criminal activity." *United States v. DeLong*, 2022 WL 823881, at *7 (N.D.

Ill. 2022). The Court finds that omitting these arguably self-serving statements do not undermine

the abundant reasons already discussed that supporting probable cause to issue the warrant.

### Conclusion

For the reasons above, the Court denies Corder's motion to suppress and motion for a

*Franks* hearing.

Date: January 25, 2023

_____
Steven C. Seeger
United States District Judge