**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Case No. 21-cr-114-1 |
| | ) | |
| ERIC CORDER. | ) | Hon. Steven C. Seeger |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

A confidential informant came to the home of Defendant Eric Corder in the middle of the afternoon to buy drugs. Instead of going to the front door, the informant went through the yard and knocked on Corder's basement bedroom window, on the side of the house. He wasn't blazing a new path. The informant had seen Corder sell drugs to other people through his bedroom window a number of times.

Corder, meanwhile, was slumbering away, oblivious to the visitor at his window. After seven minutes or so, Corder finally woke up to the sound of the knocking and came outside. The two briefly chatted, and Corder then walked the informant to a detached garage. And once there, a drug deal took place.

The informant turned over the drugs to law enforcement, and a criminal complaint soon followed. Corder now moves to suppress the evidence on Fourth Amendment grounds. For the reasons stated below, the motion is denied.

### Background

Defendant Eric Corder is charged with one count of distributing narcotics, and one count of possession of narcotics with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). *See* Indictment, at 1–2 (Dckt. No. 11). The Court assumes familiarity with the background of the case, as described in this Court's recent ruling on Defendant's other motion to suppress and for a

*Franks* hearing. *See* 1/25/2023 Mem. Opin. & Order (Dckt. No. 82). Even so, the Court offers the following nutshell summary.

The investigation began after a series of tips from confidential informants that Corder was selling narcotics out of his residence in the south side of Chicago. *Id.* at 2. Law enforcement collaborated with one of those informants, known as CS2, to set up staged drug deals on December 1 and December 15, 2020.[1] *See* Cplt., at ¶¶ 7–17 (Dckt. No. 1). The transactions involved CS2 buying narcotics from Corder while under police surveillance. *Id.* at 3. Law enforcement collected audio and video recordings of each transaction. *Id.*

The motion to suppress is about the second controlled buy between CS2 and Corder. *See* Mtn. to Suppress, at 3 (Dckt. No. 35, at 5 of 50). The parties do not dispute the material facts relating to the transaction. *See* Gov't Resp., at 7 (Dckt. No. 45); Def.'s Reply, at 3 (Dckt. No. 54) (noting the "absence of a material factual dispute").[2]

On December 15, 2020, shortly after 2:00 p.m., CS2 met with FBI and other law enforcement agents at a prearranged location. *See* Cplt., at ¶ 13 (Dckt. No. 1). The agents

---

[1] As an aside, the same individual is called CS1 and CS2 in different documents, which can be more than a little confusing. The warrant application makes clear that there were multiple informants. *See* Warrant Application 21M076, at ¶¶ 5–6 (Dckt. No. 46). The first informant provided a tip about Corder's drug operation. The second informant – the informant at issue here – assisted law enforcement in executing the controlled drug transactions, including the deal in question on December 15, 2020. The warrant application calls the second informant "CS-2." *Id.* But the criminal complaint changes the lingo, calling this person CS1 instead of CS2. *See* Cplt., at ¶¶ 7, 13–16 (Dckt. No. 1). Corder refers to this particular informant as CS2 in his motion to suppress (Dckt. No. 35), and so does the government in its response (Dckt. No. 45), so this Court will follow suit. Even so, the Court cautions the reader that CS2 is the same person as "CS-1" in the complaint.

[2] A few pages later, Corder summarized the government's assertions about visitors at his window, stating: "Defendant disputes these assertions as they are false." But read in context, this Court understands Corder to be disputing the *timing* of when CS2 made those statements to the police. That is, Corder is disputing the timing of when CS2 made those statements, not whether the statements are true. The very next sentence addresses the timing of the statements, not their truth. *See* Def.'s Reply, at 6 (Dckt. No. 54) ("Contrary to the Government[']s assertion that CS2 made these assertions to law enforcement before December 15, 2020, according to FBI [documents] these assertions . . . were made by CS2 'after' December 15, 2020 . . . .").

searched the informant for contraband, equipped him with an audio and video recording device, and provided him with $500 to complete a narcotics transaction with Corder. *Id.* CS2 then walked to Corder's residence under continuous law enforcement surveillance. *Id.*

Corder's residence is a single-family home with a backyard and a detached garage behind the house. *See* Mtn. to Suppress, at 3 (Dckt. No. 35, at 5 of 50). The entire property is enclosed by a chain link fence, which has gates at the front and the rear of the property with "No Trespassing" signs on them. *Id.*

Corder shared the residence with his sister, but Corder lived in the basement. *See* Search Warrant Application 21M87, at ¶ 6 (Dckt. No. 47). His basement bedroom had a window on the side of the house.

Pictures of the front of the house, the garage, and the walkway in the backyard are in the record. *See* Photos (Dckt. No. 55, at 10–13 of 16); Underwood Aff., at ¶ 4 (Dckt. No. 110-1) (showing pictures of the front of the house, and the back gate). Corder's basement bedroom window is not easily visible from the photographs. *Id.*; *see also* Def.'s Reply, at 2 (Dckt. No. 54) (referring to the "basement window located on the side at the rear of defendant[']s home").

CS2 was no stranger to Corder, and he was no stranger to the property. In fact, CS2 had been inside the home 20 or 30 times in the past two years. *See* Cplt., at ¶ 6 (Dckt. No. 1). CS2 had seen drugs in the basement. *Id.* He witnessed Corder "make, mix, and package narcotics for individuals inside of the basement of his residence." *Id.*

CS2 knew from personal experience that the bedroom window was the gateway for Corder's drug trafficking. CS2 "ha[d] been present inside of the basement of CORDER's residence when CORDER told individuals to go to the window in the basement or to the detached garage after CORDER received a call for narcotics." *Id.* CS2 "ha[d] also knocked on

the window himself/herself to alert CORDER if CORDER does not answer when CS-2 calls Subject Phone 2." *Id.* It was a drive-thru window, of sorts.

CS2 followed the same approach on the day in question. CS2 came to the edge of Corder's property and passed through the gate.[3] *See* Mtn. to Suppress, at 5, ¶ 10 (Dckt. No. 35, at 7 of 50). The record is unclear whether CS2 entered through the front gate or the back gate.[4] *See* Def.'s Mtn. to File Additional Exhibits, at 2 (Dckt. No. 55) (acknowledging that CS2 entered Corder's "front gate of the residence which leads to the backyard"). At a hearing, the parties

---

[3] The motion to suppress does not reveal whether CS2 came through the front gate or the back gate. Paragraph 10 of the handwritten motion to suppress is very difficult to read – to the point of near illegibility – but it appears to say "entry of the fenced in backyard." *See* Mtn. to Suppress, at 5, ¶ 10 (Dckt. No. 35, at 7 of 50). At the hearing on March 16, 2023, the Court asked Corder to decipher his handwriting. He responded that the first sentence of paragraph 10 of his motion to suppress (Dckt. No. 35) says: "Upon agent CS2's initial entry of the fenced in backyard – curtilage of defendant's home agent CS2 approached the home itself." In his reply brief, Corder asserts that CS2 "bypass[ed] the front door and entered the fenced and gated backyard and rear of defendants [sic] home." *See* Def.'s Reply, at 4 (Dckt. No. 54); *see also id.* at 10 ("Entering the fenced and gated backyard of defendants [sic] residence is not a route to the front door."). In a later motion to supplement, Corder suggested that CS2 entered through the front gate, not the back gate. *See* Def.'s Mtn. to File Additional Exhibits, at 2 (Dckt. No. 55) ("CS2 can be heard entering defendant['s] front gate of the residence which leads to backyard."). Putting it all together, Corder seemed to be saying that CS2 entered through the front gate and walked to the side of his home (by his bedroom window), which he considers part of his backyard (because it is behind the front gate). In his mind, anything behind the front gate is the backyard. One might wonder how Corder could know where CS2 walked, given that he was asleep at the time. To his credit, Corder acknowledged at the hearing on March 16, 2023 that he does not know whether CS2 entered from the front or the back. All parties agree that CS2 eventually *left* Corder's property by walking through the front gate by the front of the house, not the back gate in the backyard.

[4] To clear things up, this Court issued an Order and directed the government to file a supplemental declaration from the FBI agent, and address whether CS2 entered from the front gate or the back gate. *See* 3/6/2023 Order (Dckt. No. 96). The government later did so. *See* Underwood Aff. (Dckt. No. 110-1). Unfortunately, the agent confirmed that the FBI does not know if CS2 entered the property from the front or the back. The agent "could not visually see which direction CS-2 walked when CS-2 reached CORDER's residence, whether CS-2 went through the gate on the front, side of the residence, or the gate in the rear of the residence." *Id.* at ¶ 4. The agent added that CS2 "inadvertently covered the visual aspect of the recording device while CS-2 was walking based on the weather conditions and its placement on CS-2." *Id.* But the declaration does include a helpful picture of the front of the house, including the front gate and the side walkway. *Id.* The agent also reported that CS2 "entered the gate on the front, side of the residence" on December 1, 2020, two weeks before the incident in question on December 15, 2020. *Id.* at ¶ 5. That data point lends credence to the notion that CS2 followed the same path on December 15, 2020.

confirmed that they do not know whether CS2 entered from the front or the back of the property.[5]

The property includes a paved sidewalk that runs the full length of the property, along a side fence, from front to back. CS2 took that sidewalk to the side of the house, and approached the basement window of Corder's bedroom. *See* Mtn. to Suppress, at 7, ¶ 10; *see also* Underwood Aff., at ¶ 4 (Dckt. No. 110-1) (including a photo of the sidewalk from the front gate); Photos (Dckt. No. 55, at 10–13 of 16) (showing the sidewalk in the backyard).

CS2 then knocked on the window to get Corder's attention. CS2 started knocking, but no one answered right away. So CS2 kept knocking, and waiting. *See* Mtn. to Suppress, at 5 (Dckt. No. 35, at 7 of 50).[6] The recording captured intermittent sounds of knocking, for several minutes.

According to Corder, CS2 allegedly shined his cell phone light into the bedroom.[7] *Id.* at ¶ 13. Corder alleges that he was asleep at the time, and so he did not hear the knocks at first. *Id.* at ¶ 12.

---

[5] The Court raised this question at a hearing on March 16, 2023. Corder confirmed that he does not know if CS2 entered the property from the front gate or the back gate. Likewise, the government confirmed that it does know if CS2 entered from the front or the back. For purposes of the motion to suppress, the Court assumes that CS2 entered Corder's property from the front gate, not the back gate. That's consistent with how CS2 entered the property on December 1, 2020, and how CS2 exited the property on December 15, 2020 (the day in question).

[6] In the motion to suppress, Corder suggests that CS2 recorded Corder speaking inside his residence while CS2 was outside. *See* Mtn. to Suppress, at 5 (Dckt. No. 35, at 7 of 50). But no such conversation can be heard on the recordings. Corder's voice cannot be heard until Corder briefly greeted CS2 (it sounded liked "Aight") to acknowledge the knocking. Only minutes passed between Corder greeting CS2 and the two entering the detached garage, at which point the video resumes.

[7] The video camera was obscured, so it does not show whether CS2 was shining a light through Corder's basement window. Even if CS2 used a flashlight, it would not add any heft to the constitutional equation. CS2 did not use the flashlight to spot any criminality – say, drugs or a firearm. CS2 used the flashlight to wake Corder up (according to Corder, that is). The flashlight was another way to wake Corder up and get his attention, using light instead of sound (from the knocking). As a result, the flashlight is unlike, say, using "super-high-powered binoculars" to detect contraband. *See Jardines*, 569 U.S. at 12 (Kagan, J., concurring). CS2 did not use the flashlight to spot criminality.

After several minutes, Corder finally woke up and responded to CS2. *Id.* at ¶ 14. The whole thing – from CS2's first knock, to Corder's verbal response – took about seven minutes.[8]

A few minutes later, Corder emerged from the basement and met CS2 in the backyard. *Id.* at ¶ 16. The two greeted each other and exchanged pleasantries for about fifteen seconds. *Id.*; *see also* Exhibit C, at 14:53:41 – 14:53:56 (Dckt. No. 106). Corder then invited CS2 into the garage, and they went in. *See* Cplt., at ¶ 16 (Dckt. No. 1).

Once inside the garage, CS2 and Corder got down to business, and the first order of business was the transaction. Before long, Corder allegedly sold CS2 drugs. *Id.* at ¶¶ 15–16. The video and audio recording captured the conversation:

| | |
|---|---|
| CS2: | "You want the Sauce?" |
| Corder: | "Yeah." |
| CS2: | "You want the hundred?" |
| Corder: | "I want the whole hundred." |

*Id.* The audio recording then contains the sound of what appears to be money being counted, then:

| | |
|---|---|
| CS2: | "Five of 'em." |
| Corder: | "Five hard?" |

---

[8] The audio recording confirms how long CS2 waited for Corder at the basement window. The time between the first audible knocks (at 14:43:46) and the eventual response by Corder (at 14:50:47) is about seven minutes. *Hear* Exhibit C, at 14:42:50 – 14:50:47 (Dckt. No. 106); *hear generally id.* at 14:42:50 (CS2 heard going through the gate); *id.* at 14:43:46 (first knock); *id.* at 14:44:42 (second knock); *id.* at 14:45:42 (third knock); *id.* at 14:45:47 (fourth knock); *id.* at 14:49:13 (fifth knock); *id.* at 14:50:15 (sixth knock); *id.* at 14:50:47 (Corder heard for the first time saying "Aight"); *id.* at 14:53:43 (CS2 and Corder talking); *id.* at 14:54:09 (the drug transaction in the garage). For his part, Corder alleges that CS2 knocked for "no less than six," and "approximately eight minutes." *See* Def.'s Reply, at 15 (Dckt. No. 54); Mtn. to Suppress, at 5, ¶ 11 (Dckt. No. 35, at 7 of 50). After Corder is heard on the recording, he emerges from the house less than three minutes later. At that point, he and CS2 can be heard greeting each other in the backyard before entering the garage. *Hear* Exhibit C, at 14:53:41 – 14:53:56. The video camera was obscured during this portion of the interaction and resumes contemporaneously with CS2 entering the garage with Corder.

CS2:             "Yeah."

*Id.*

After doing the deal, CS2 and Corder chatted for about ten more minutes.  *See* Cplt., at

¶ 14 (Dckt. No. 1); *see also* Warrant Application 21M076, at ¶ 20 (Dckt. No. 46).  At some point

during the exchange, Corder began to complain to CS2 about a woman living in Corder's

detached garage who owed him money.  *Id.*  Corder stated:

> I was gonna call to give it to you. . . .  She gon' work now. . . .  I done put you[]
> out here 10 times you keep coming back, no this time take your [stuff] with you
> . . . .  I'm really not making money off you, I spend [unintelligible].  I feed you, I
> house you, then the money I do make they don't even pay me I gotta work days
> on [unintelligible].  You owe me some damn money from the other day.  Wake up
> tell me I'm not goin' keep goin', she can get to steppin' . . . .  Tell me this how
> this go, no this ain't how this go, Imma let you lure me into this . . . .  They owe
> me money I gotta wait on you today for my money.  I gotta wait eight days to get
> my money, you can't work thirty minutes but I gotta wait eight days.  See what it
> like to wake up sick.  [laughter]

*Id.*

Special Agent James Underwood, the officer who prepared the warrant affidavit, stated

that he believed this conversation referred to a woman whom Corder was trafficking sexually.

*Id.* at ¶ 21.  He further explained that the phrase "waking up sick" referred to the drug

withdrawal symptoms that the woman would experience if Corder were to cut off her supply of

narcotics.  *Id.*

In the conversation with CS2, Corder went on to complain:

> I'm out here texting her, I'm like look don't fall in love with me, don't shoot that
> [] no more then I gotta put her in her feelings, I'm like look don't call me woowoo
> don't shoot that [] no more.  Don't knock on the window, if I lock the window
> that mean nothing happening. . . .  You called, I said no, keep calling keep calling,
> night here come to the window knockin' . . . c'mon man I can't get no sleep. . . .
> Cause I be up all night on [unintelligible] program, so then I gotta stay up all
> night servin' yo ass, then I gotta get these people. . . .  Let me know where these
> [guys] is?  You don't know.  Tell me where T lives?  You don't know.  Well then
> fine then, go stay in his garage, tell him to bring you something to eat.  What's the

7

matter?  You staying with me you getting this back and you owe me.  You wanna run it up a hundred dollars and now you want to keep coming up short?

*Id.* at ¶¶ 21, 25.  In the warrant application, Agent Underwood explained that Corder was complaining that the woman was knocking on his basement window throughout the night to receive drugs, and that she owed him money.  *Id.* at ¶¶ 23, 27.

After the conversation, CS2 left the garage and returned to the law enforcement agents.  *See* Cplt., at ¶ 16 (Dckt. No. 1).  He handed them 14.3 grams of a tan powdery substance suspected to be heroin, and 1.5 grams of a white, rock-like substance suspected to be crack cocaine.  *Id.*  Tests later confirmed that the substances were fentanyl-laced heroin and cocaine.  *Id.*

Law enforcement used the evidence from this controlled buy – along with evidence from the first buy, information from other informants, and police surveillance – to apply for and execute two warrants to search Corder's residence.  *See* Gov't Resp., at 6 (Dckt. No. 45).  In executing the first warrant, law enforcement recovered a loaded firearm and suspected narcotics from inside the basement of Corder's residence.  *See* Warrant Application 21M87, at ¶ 8 (Dckt. No. 47).  Execution of the second warrant resulted in the seizure of approximately five cell phones, a laptop, two tablets, a SIM card, and two memory cards.  *See* Gov't Resp., at 6.

On February 17, 2021, Corder was charged by complaint with distribution of narcotics, in violation of 21 U.S.C. § 841(a).  *See* Cplt., at 1 (Dckt. No. 1).  And on March 16, 2021, a grand jury returned an indictment charging Corder with one count of distributing narcotics on December 15, 2021, and one count of possession of narcotics with intent to distribute them on February 17, 2021, both in violation of 21 U.S.C. § 841(a)(1).  *See* Indictment, at 1–2 (Dckt. No. 11).

Corder filed a flurry of motions, including a motion for a *Franks* hearing. (Dckt. Nos. 35, 40, 42, 53). This Court denied Corder's motion for a *Franks* hearing. *See* 1/25/2023 Mem. Opin. & Order (Dckt. No. 82). In the motion at hand, Corder challenges the second controlled buy on Fourth Amendment grounds. *See* Mtn. to Suppress (Dckt. No. 35).[9]

## Analysis

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *See* U.S. Const. amend. IV. The Supreme Court has long recognized that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *See Payton v. New York,* 445 U.S. 573, 585 (1980).

The "very core" of the Fourth Amendment guarantee is "the right of a man to retreat into his own home and there be free from unreasonable government intrusion." *Caniglia v. Strom*, 141 S. Ct. 1596, 1599 (2021) (citations omitted). When it comes to the Fourth Amendment, "the home is first among equals." *See Florida v. Jardines*, 569 U.S. 1, 6 (2013). From a constitutional standpoint, there's no place like home.

The constitutional protection afforded to the home extends beyond the residence itself to the curtilage of the home, as well. *See United States v. Sweeney*, 821 F.3d 893, 900 (7th Cir.

---

[9] The motion to suppress is over 100 pages long, and it is handwritten. At times, the copy is faded and, in spots, is difficult to read. Still, the Court gleaned more than enough to understand the argument. Corder's signature appears on page 27. *See* Mtn. to Suppress, at 27 (Dckt. No. 35, at 30 of 50). The next page is entitled "Standard of Review of Tainted Warrant." *Id.* at 28. Many of the following pages are difficult to read. Some are upside down, many are faded, and some have large blue "X"s crossing out the entire page of text. In a later filing, Corder explained that the "X"s appeared by mistake, because he was using recycled paper, and the Clerk scanned the back side of the page even though it was not germane. "It was not intended for the Clerk to copy the back of the paper that's why there is a big X in the entire page. . . . So every other page excluding the page with the X in it is the true intended written motion. The Clerk must have the scanner setting to scan front and back." *See* 8/23/2022 Affidavit, at ¶ 9 (Dckt. No. 62).

2016).  "The home's curtilage encompasses the area outside the home itself but so close to and intimately connected with the home and the activities that normally go on there that it can reasonably be considered part of the home."  *United States v. French*, 291 F.3d 945, 951 (7th Cir. 2002) (citation omitted).

"The protection afforded the curtilage is essentially a protection of families and personal privacy in an area intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened."  *California v. Ciraolo*, 476 U.S. 207, 212–13 (1986). Sometimes the curtilage of a house – like a front porch – is the best part of the house.

"When a law enforcement officer physically intrudes on the curtilage to gather evidence, a search within the meaning of the Fourth Amendment has occurred."  *Collins v. Virginia*, 138 S. Ct. 1663, 1670 (2018) (citing *Jardines*, 569 U.S. at 11).  "A warrantless search of a home's curtilage implicates the 'very core' of the Fourth Amendment and presumptively is unreasonable."  *Bleavins v. Bartels*, 422 F.3d 445, 451 (7th Cir. 2005) (citations omitted).

A "search" occurs within the meaning of the Fourth Amendment when "the Government obtains information by physically intruding on a constitutionally protected area," or "when government officers violate a person's reasonable expectation of privacy."  *United States v. Jones*, 565 U.S. 400, 406, 406 n.3 (2012) (quoting *Katz v. United States*, 389 U.S. 347, 360 (1967)) (quotation marks omitted); *see also United States v. Correa*, 908 F.3d 208, 217 (7th Cir. 2018) (describing the two analytical approaches used by the Supreme Court to determine whether a search has occurred).

Corder moves to suppress all evidence related to the purchase on December 15, 2020. The thrust of the argument is that CS2 acted as a government agent and performed an unreasonable search when he "entered the fenced curtilage of defendants [sic] home to gather

10

evidence" without "a warrant, consent, or exigent circumstance." *See* Def.'s Reply, at 1 (Dckt. No. 54); *see also* Mtn. to Suppress (Dckt. No. 35). The government does not dispute that CS2 was acting as a government agent.

The government offers three responses. First, the government argues that CS2 did not unlawfully intrude on the property because Corder had a practice of receiving CS2 and other solicitors at his basement window. *See* Gov't Resp., at 8 (Dckt. No. 45). By using his window as a thoroughfare for visitors, Corder had granted visitors like CS2 an implicit license to approach and summon him by knocking. *Id.* at 7.

Second, the government argues that CS2 did not perform a "search" within the meaning of the Fourth Amendment when he knocked on the basement window. *Id.* at 9. A search takes place when the government "has physically occupied private property for the purpose of obtaining information." *Sweeney*, 821 F.3d at 899 (internal quotation marks omitted). The government contends that CS2's conduct did not amount to a search because he sought only "to have an interaction with Corder." *See* Gov't Resp., at 9 (Dckt. No. 45). In its view, it was a routine knock-and-talk, not a search for incriminating evidence.

Third, the government contends that, even if CS2's presence on the property was unlawful, Corder consented to the interaction that ensued. *Id.* at 10. That is, even if CS2's initial entry onto the property was unlawful, Corder freely chose to exit the basement, continue the conversation with CS2, invite him into the garage, and sell him drugs. *Id.* In the government's view, any prior illegality does not taint the evidence of the drug transaction.

The Court will address the first and the third arguments, both of which provide a sufficient, independent basis for denying the motion. Corder gave CS2 an implicit license to enter his property to buy drugs. And once Corder discovered CS2 on the property, he extended

the stay, by walking and welcoming him to the garage.  That's implicit consent, and actual consent.

## I.       The Implicit License to Enter the Property.

For starters, Corder's argument fails for the simple reason that he gave CS2 an implicit license to enter his property and knock on his bedroom window.  In fact, the knock-and-go operation at his window was how he ran his alleged drug business.  The bedroom window was the functional equivalent of a drive-thru window.

Homeowners grant visitors an implicit, but limited, license "to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave."  *Jardines*, 569 U.S. at 8; *see also Gaddis v. DeMattei*, 30 F.4th 625, 631 (7th Cir. 2022) ("It has long been established that the Fourth Amendment is not implicated when officers approach a doorway, knock, wait for an answer, and engage in conversation until asked to leave.").

A home may be a person's castle, but most of us don't have moats and drawbridges.  Visitors can walk up to the door – or wherever else the homeowner typically greets visitors.  Homes are castles, but not islands.

That license is not necessarily limited to the front door.  The Supreme Court itself has not definitively resolved when officers can approach an area of a home other than the front door.  *See Carroll v. Carman*, 574 U.S. 13, 18–19 (2014) (reversing the Third Circuit's holding that officers must first go to the front door to enjoy qualified immunity).  Even so, the Supreme Court has laid down a simple, overarching rule:  "of course, officers may generally take actions that 'any private citizen might do without fear of liability.'"  *See Caniglia*, 141 S. Ct. at 1599 (quoting *Jardines*, 569 U.S. at 8); *see also Kentucky v. King*, 563 U.S. 452, 469 (2011).

12

The Seventh Circuit and other Courts of Appeals have applied that principle when law enforcement enter other parts of the property. *See Carroll*, 574 U.S. at 19 (noting that the Third Circuit's rule was "perplexing" in light of "decisions of other federal and state courts"). The case law confirms that police officers do not have a disfavored status, with a lesser license than members of the public. When it comes to law enforcement, the law is not "you can't go where the others go / 'cause you don't look like they do." *Hear* Bruce Hornsby, The Way It Is (RCA Records 1986).

Law enforcement "may walk up to any part of private property that is otherwise open to visitors or delivery people." *United States v. Contreras*, 820 F.3d 255, 261 (7th Cir. 2016); *see also United States v. LePage*, 477 F.3d 485, 489 (7th Cir. 2007) ("Officers may walk up to that part of private property that is open to visitors or delivery people."); *French*, 291 F.3d at 954 ("[I]t is not objectionable for an officer to come upon that part of [private] property which has been opened to public common use.") (citation omitted; brackets in original); *United States v. James*, 40 F.3d 850, 862 (7th Cir. 1994), *vacated on other grounds*, 616 U.S. 1022 (1995) (holding that officers did not violate the Fourth Amendment by approaching a side door that was "accessible to the general public" and "was commonly used for entering the duplex from the nearby alley"); *Davis v. Chalstrom*, 595 F. App'x 627, 630 (7th Cir. 2014) ("[A] government agent is permitted to enter the curtilage of the home in the same way that any delivery person or passerby could: the agent may approach any entrance to the house that is open to visitors (even if it is not the front door) and make warrantless observations of the exterior."); *United States v. Shuck*, 713 F.3d 563, 567 (10th Cir. 2013) (holding that the license to approach a house extends to the normal path taken by visitors); 1 Wayne R. LaFave, Search & Seizure: A Treatise on the Fourth Amendment § 2.3(e) (6th ed. 2020) ("The route any visitor to a residence would use is

not private in the Fourth Amendment sense, and thus if police take that route for the purpose of making a general inquiry or for some other legitimate reason, they are free to keep their eyes open . . . .") (internal quotation marks and citations omitted).

In *James*, for example, the Seventh Circuit addressed a Fourth Amendment challenge to a search that involved the back of a building. *See James*, 40 F.3d at 861–62. Officers walked to the back of the first floor of a duplex, and they "used a paved walkway along the side of the duplex leading to the rear side door." *Id.* at 862. As they walked toward the back door, they spotted drugs and guns through the windows. *Id.* at 857.

The Seventh Circuit found no Fourth Amendment violation because the police officers were "lawfully situated" along that back pathway when they spotted the contraband. *Id.* at 862. "The passage to the rear side door was not impeded by a gate or fence. Both the paved walkway and the rear side door were accessible to the general public and the rear side door was commonly used for entering the duplex from the nearby alley." *Id.* The fact that they were not at the front door was not dispositive.

The search satisfied the Fourth Amendment's reasonableness requirement in light of the common usage of the path to the back of the building. "[W]here the back door of a residence is readily accessible to the general public, the Fourth Amendment is not implicated when police officers approach that door in the reasonable belief that it is a principal means of access to the dwelling." *Id.*

Here, too, CS2 followed a footpath from the front gate to Corder's window. It was a well-worn path. CS2 had knowledge of other buyers entering the property, knocking on Corder's window, and waiting for Corder to answer the call. *See* Gov't Resp., at 8 (Dckt. No.

45). He followed in their footsteps. In fact, CS2 himself had knocked on the window to alert Corder at other times using the same method. *See* Cplt., at ¶ 6 (Dckt. No. 1).

Entering the yard and knocking on the basement window did not come out of the blue. It is not as if CS2 got the bright idea to rap on Corder's window, and did so unexpectedly on the day in question. Quite the contrary. In effect, Corder treated his basement window as his front door for greeting buyers.

True, Corder's property had a fence with a gate, unlike the property at issue in *James*. Even so, Corder had a practice of welcoming visitors to his property at his bedroom window, and the gate did not pose much of a barrier to those visitors. The gate functioned more like a turnstile than a locked door, and Corder welcomed visitors on the other side without any fuss or fanfare.

It is true that a "license may be implied from the habits of the country." *See Jardines*, 569 U.S. at 8. An implied license has its roots in custom. *Id.* at 9. And it is true that most of us have not given other people a license to enter our property and knock on our bedroom windows.

But at the end of the day, the touchstone of the Fourth Amendment is reasonableness. *See Caniglia*, 141 S. Ct. at 1599 ("To be sure, the Fourth Amendment does not prohibit all unwelcome intrusions on private property – only unreasonable ones.") (cleaned up). Reasonableness, in turn, depends on the facts on the ground, including the unique situation at hand.

Other visitors had entered Corder's property and knocked on his window to buy drugs – with his blessing. So it was not unreasonable for CS2 to go the same route and do the same thing. One person's window is another person's front door.

15

The entry onto the property was reasonable because Corder had a practice of engaging with buyers and visitors at his bedroom window. But that conclusion does not end the inquiry. An entry onto property must be reasonable in place, time, and purpose. *See United States v. Gutierrez*, 760 F.3d 750, 756–57 (7th Cir. 2014) ("[T]here is an implied license to approach the door, knock, and wait briefly to be received – but this license has a limited scope, which is based on custom. Specifically, this license is limited in space, time, and purpose.") (citing *Jardines*, 569 U.S. at 8).

Corder alleges that CS2 knocked for "no less than six," and "approximately eight minutes." *See* Def.'s Reply, at 15 (Dckt. No. 54); Mtn. to Suppress, at 5 (Dckt. No. 35, at 7 of 50). The audio recording confirms his account. Roughly seven minutes passed between CS2's knocking and Corder's greeting at the window. *See* Exhibit C, at 14:43:46 – 14:50:47 (Dckt. No. 106). CS2 knocked six times in that span of time. *Id.*

"The scope of a license – express or implied – is limited not only to a particular area but also a specific purpose." *Jardines*, 569 U.S. at 9. That purpose, in turn, is informed by a visitor's relationship to the homeowner.

The presumptive welcome mat is larger for a friend than a stranger. That is, someone who has been in your house 20 to 30 times probably can linger longer than someone who has never been there before. As a matter of social custom, it matters who the person is, and whether that person has a relationship with the homeowner.

If a stranger came to the door, a seven- or eight-minute stay might not qualify as staying "briefly." *See Jardines*, 569 U.S. at 20 (Alito, J., dissenting) ("The license [to approach and knock] is limited to the amount of time it would customarily take to approach the door, pause long enough to see if someone is home, and (if not expressly invited to stay longer), leave."); *see*

*also* LaFave, *supra*, at § 2.3(c) ("Regarding the temporal limits, both the majority and dissenting Justices in *Jardines* agree that a visitor may not dilly-dally. . . .  The officer's presence on the curtilage may exceed the 'implicit license' merely because of its length, so that even plain-view situations arising thereafter become unlawful searches.").

But CS2 was no stranger to Corder.  CS2 wasn't paying Corder a purely social visit, and he wasn't loitering on Corder's property for no particular reason.  He was an acquaintance and previous customer looking to engage in a commercial transaction with a seller.

The seven-minute passage of time was slight, in the grand scheme of things.  *See United States v. Carloss*, 818 F.3d 988, 998 (10th Cir. 2016) (declining "to place a specific time on how long a person can knock before exceeding the scope of the implied license" and finding that officers did not exceed the scope after waiting for several minutes after knocking); *Clark v. City of Williamsburg*, 388 F. Supp. 3d 1346, 1367 (D. Kan. 2019) (finding that an officer did not exceed the scope of the implied license by remaining "more than a few minutes and left within a minute of being asked to leave"); *cf. Bovat v. Vermont*, 141 S. Ct. 22, 23 (2020) (denying certiorari but noting that the Fourth Amendment "hardly tolerates" an officer lingering on the property for fifteen minutes without ever reaching the front door).

Here, the length of time seems reasonable given the personal relationship and the commercial nature of the visit.  In a related context, the Supreme Court has recognized that the protections afforded to a home can vary when the homeowner invites a visitor for commercial, non-residential purposes.  "[W]hen the home is converted into a commercial center to which outsiders are invited for purposes of transacting unlawful business, that business is entitled to no greater sanctity than if it were carried on in a store, a garage, a car, or on the street.  A government agent, in the same manner as a private person, may accept an invitation to do

17

business and may enter upon the premises for the very purposes contemplated by the occupant."
*Lewis v. United States*, 385 U.S. 206, 211 (1966); *see also United States v. Shelton*, 997 F.3d
749, 766 (7th Cir. 2021) ("[E]ntry by an undercover agent is not illegal if he entered for the 'very
purposes contemplated by the occupant.'") (quoting *United States v. Ressler*, 536 F.2d 208, 211
(7th Cir. 1976)).

Although he was uninvited, CS2 knocked and waited for his drug supplier for about
seven minutes. That's less time than most people spend in a typical visit to a drug store. (And
most of us have waited longer for prescriptions.)

Based on the facts, Corder granted an implicit license for CS2 to enter the property and
summon him at his basement window. The whole situation was closer to a drive-thru lane at a
fast-food restaurant than an unexpected knock at a bedroom window. And the service was fast
enough to pass constitutional muster.

## II.    Consent to the Search

Corder's motion to suppress fails for a second, independent reason. Even if CS2
unlawfully intruded on the property, Corder consented to the search that followed. He rolled out
the welcome mat once he discovered CS2 in his backyard.

When Corder spotted CS2 on the property, Corder didn't shoo him away. Corder did not
escort him off the property, or direct him to leave, or call the police, or anything of that sort. He
didn't scold him for knocking on his window, or for loitering on his property too long. Instead,
Corder responded to the visitor by extending – not ending – the stay.

Corder came out of his home and chatted with CS2 in the backyard. And then, Corder
walked with CS2 to the detached garage, where their alleged drug transaction took place.

18

Consent can justify a warrantless search. *See United States v. Davis*, 44 F.4th 685, 688 (7th Cir. 2022). But the consent must be voluntary. *See United States v. Robeles-Ortega*, 348 F.3d 679, 681 (7th Cir. 2003). "When the government justifies a search after illegal entry based on voluntary consent, the government must show that the illegal entry did not taint that consent." *See Davis*, 44 F.4th at 688; *see also* 4 Wayne R. LaFave, Search & Seizure: A Treatise on the Fourth Amendment § 8.2(d) (6th ed. 2020) ("[E]vidence obtained by the purported consent should be held admissible only if it is determined that the consent was both voluntary and not an exploitation of the prior illegality.").

Corder does not deny that he consented to CS2 staying on his property. Instead, he merely argues that CS2's alleged curtilage violation tainted his consent.[10] *See* Mtn. to Suppress, at 13 (Dckt. No. 35, at 15 of 50).

"Whether consent was tainted is a question of attenuation." *Davis*, 44 F.4th at 689. Attenuation is a "fact-intensive" question, and the government bears the burden of persuasion. *See United States v. Conrad*, 673 F.3d 728, 733 (7th Cir. 2012).

The question is whether consent was "obtained by exploitation of the preceding Fourth Amendment violation, or instead by means *sufficiently distinguishable* to be purged of the

---

[10] In his reply brief, Corder argues for the first time that his consent was not voluntary because "it was acquired by means of an unconstitutional illegal ruse." *See* Def.'s Reply, at 19 (Dckt. No. 54). That argument comes too late. *See United States v. Raney*, 797 F.3d 454, 464 (7th Cir. 2015) (arguments raised for the first time in reply briefs are waived). And on the merits, it is a nonstarter. *See United States v. Thompson*, 811 F.3d 944, 948 (7th Cir. 2016) ("It is firmly established that the government may use informants and that an informant's failure to disclose his true identity does not render consent to his presence invalid."); *see also Hoffa v. United States*, 385 U.S. 293, 302 (1966). Furthermore, the Court sees no other evidence indicating that consent was involuntary in this case. *See, e.g.*, *United States v. Thompson*, 842 F.3d 1002, 1010 (7th Cir. 2016) (finding consent voluntary where the defendant consented to law enforcement entering his apartment, and where there was no evidence that law enforcement used or threatened physical force); *United States v. Punzo*, 208 F. App'x 468, 471 (7th Cir. 2006) (holding that an occupant's consent to search a home was voluntary where "[t]he officers did not forcibly enter the house, [he] was not under arrest when he consented, and the officers did not threaten to secure a warrant if [he] refused to cooperate").

primary taint." *Davis*, 44 F.4th at 689 (cleaned up) (emphasis in original); *see also Robeles-Ortega*, 348 F.3d at 681. The Supreme Court has identified three factors that come into play, including (1) the temporal proximity of the illegal entry and the consent; (2) the presence of intervening circumstances, and, particularly, (3) the purpose and flagrancy of the official misconduct. *See Brown v. Illinois*, 422 U.S. 590, 603–04 (1975).

Here, the Court finds that Corder's voluntary consent was sufficiently attenuated from the initial entry. One *Brown* factor, the passage of time, cuts in Corder's favor. The two remaining factors, however, cut decisively against exclusion. So, even if CS2's intrusion on the property was problematic, the later sale broke the chain. The entry and the consent were sufficiently attenuated, so the consent was valid.

## A.     Temporal Proximity

The first factor – temporal proximity of the illegal entry and consent – weighs modestly in Corder's favor. The primary concern is whether the defendant had adequate time after the illegal entry to reflect on his situation.

Here, CS2 entered the property and started knocking within a minute. He knocked on-and-off for the next seven minutes. *See* Exhibit C, at 14:43:46 – 14:50:47 (Dckt. No. 106). That's when Corder finally responded. *Id.* Corder has since explained that he was asleep at the time. *See* Mtn. to Suppress, at 5 (Dckt. No. 35, at 7 of 50).

Three minutes later, Corder emerged from the house and chatted briefly with CS2 in the backyard. *See* Exhibit C, at 14:53:43 (Dckt. No. 106). And then, they entered the garage, and the alleged drug deal soon followed. *Id.* at 14:54:09. Roughly 10 or 11 minutes passed between the first knock at the window and the drug sale in the garage. *Id.* at 14:43:46 (first knock); *id.* at

14:54:09 (the drug transaction in the garage). After the sale, they chatted for another 10 minutes or so. *Id.* at 15:02:46. From soup to nuts, the whole thing lasted less than half an hour.

Courts have observed that several minutes may be insufficient to purge the taint of a constitutional violation. *See Robeles-Ortega*, 348 F.3d at 683 (noting that, where consent was obtained within minutes of illegal entry, it was "difficult to imagine a shorter time frame between the unconstitutional action and consent"); *Utah v. Strieff*, 579 U.S. 232, 239 (2016) (holding that this factor favored suppression where "only minutes" elapsed between the search and illegal stop). "The time span between the claimed police misconduct and the search is not dispositive, however." *See United States v. Parker*, 469 F.3d 1074, 1078–79 (7th Cir. 2006).

Not much time passed between the entry onto the property and the sale. All told, it took about 10 or 11 minutes. Based on the clock alone, the unlawful entry could have tainted Corder's consent.

That said, it matters what happened while the minutes ticked away. That is, the Court must consider the context and whether it "helps the passage of time attenuate the underlying violation." *Conrad*, 673 F.3d at 733–34 (citing *Rawlings v. Kentucky*, 448 U.S. 98, 107–08 (1980)).

For example, in *United States v. Conrad*, the Seventh Circuit drew attention to the freedom of movement. The defendant was not "in the custody of law enforcement," and he "was never restrained through means of physical force or a show of authority." *Id.* at 733 (internal quotation marks omitted). The Court of Appeals concluded that "a reasonable person in the defendant's position would have believed that he was free to leave at any time." *Id.* (internal quotation marks omitted).

So too here. As in *Conrad*, Corder was not in custody when he gave consent, and he never lost his freedom of movement. In the short time that elapsed between the alleged curtilage violation and Corder's consent, Corder was in the comfort of his own home and able to "reflect upon his circumstances." *Id.* at 733.

Despite Corder's claims to the contrary, he was not seized in a Fourth Amendment sense when CS2 rapped on his basement window. He faced only an acquaintance knocking at his window – not a uniformed police officer – and he could have ignored the visitor or told him to leave. *See Kentucky v. King*, 563 U.S. 452, 469 (2011) ("[W]hether the person who knocks on the door and requests the opportunity to speak is a police officer or private citizen, the occupant has no obligation to open the door to speak."). Even after answering and coming outside, a reasonable person in Corder's position would have felt free to end the conversation, retreat into his home, and go back to bed. *Id.*

So, the first factor cuts in Corder's favor, but marginally. Only a handful of minutes passed between the alleged curtilage violation and Corder's consent. But all the while, Corder maintained his freedom to come and go (and go back to sleep) as he pleased.

### B. Intervening Circumstances

The passage of time is only part of the story. "[T]o draw any conclusions from [the] timing," a district court "must consider the temporal proximity factor in conjunction with the presence of intervening circumstances." *United States v. Reed*, 349 F.3d 457, 464 (7th Cir. 2003) (citing *United States v. Fazio*, 914 F.2d 950, 958 (7th Cir. 1990)); *see also Conrad*, 673 F.3d at 733 ("As for the first factor, the lapse of time, there is no 'bright-line' test . . . .") (internal quotation marks omitted).

The second factor – the presence of intervening circumstances – weighs in favor of a finding of attenuation. After Corder met CS2 in the backyard, he invited CS2 into a completely different physical space. They moved from the backyard and into the detached garage, where the two engaged in the alleged drug transaction and continued their conversation at length.

This kind of change in venue and continued engagement – prompted by Defendant himself – is an intervening circumstance that tips in favor of attenuation. *See Conrad*, 673 F.3d at 735 (identifying an intervening circumstance where defendant volunteered to go from his family home to a separate apartment in which "he was likely as or more comfortable" and "in a better position to decide whether to stand on his constitutional rights"); *see also United States v. Seidman*, 156 F.3d 542, 549 (4th Cir. 1998) (holding that any taint had dissipated from an informant's illegal entry into subject's house when the informant was warmly greeted by the subject, who explained that he did not answer the door because he was in the basement and who then carried on a 45-minute conversation with the informant); *United States v. Liss*, 103 F.3d 617, 621 (7th Cir. 1997) (explaining that exclusion would be appropriate if the police were to "exploit illegally-obtained knowledge to coerce an individual into providing consent," and that this danger "would seem to loom larger where the illegal search and subsequent consent search were of the same location").

Chatting with CS2, walking to the garage, chatting some more, and selling drugs was an "act of free will independent" of CS2's knocking on the window. *See Parker*, 469 F.3d at 1079. The Court concludes that intervening circumstances weigh in favor of attenuation.

### C.      Purpose and Flagrancy of the Misconduct

Finally, the third factor – the purpose and flagrancy of the official misconduct – weighs

heavily in favor of attenuation.  Any alleged misconduct by CS2 was minimal.  At worst, he

stayed and knocked at the window a little too long.

This factor "is considered the most important factor because it is tied directly to the

rationale underlying the exclusionary rule, deterrence of police misconduct."  *Conrad*, 673 F.3d

at 735 (citation omitted); *see also McDaniel v. Polley*, 847 F.3d 887, 896 (7th Cir. 2017) ("The

flagrancy of police misconduct is the most important element of our analysis because the

exclusionary rule is aimed at deterring police misconduct. . . .  When an officer's conduct is

negligent but not flagrant or purposeful, the exclusionary rule's objective is not served and

strongly favors admissibility.").

When assessing the third factor, courts consider the conduct before and after the

constitutional violation.  *Id.*  "Courts have previously found that a Fourth Amendment violation

was flagrant and purposeful where (1) the impropriety of the official's misconduct was obvious

or the official knew, at the time, that his conduct was likely unconstitutional but engaged in it

nevertheless; and (2) the misconduct was investigatory in design and purpose and executed in the

hope that something might turn up."  *United States v. Carter*, 573 F.3d 418, 425 (7th Cir. 2009)

(internal quotation marks omitted).

Additionally, a violation is not flagrant "[w]here the police erred but the record does not

support an inference of bad faith."  *Id.* at 425–26; *see also Conrad*, 673 F.3d at 735 ("'Bad faith'

cuts against attenuation."); *Strieff*, 579 U.S. at 243 (holding that police misconduct is not flagrant

where police erred but the record does not support an inference of bad faith).  In particular,

actions that were "coercive or calculated to cause surprise, fright, or confusion" cut against attenuation. *Conrad*, 673 F.3d at 735–36 (internal quotation marks omitted).

Here, the nature of alleged misconduct is mild. An acquaintance entered Corder's property without express permission and lingered there for about seven minutes after knocking. CS2's only mistake was perhaps overstaying his implied license to approach Corder's window, "knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Jardines*, 569 U.S. at 8. Instead of one or two minutes, CS2 waited seven.

To the extent that CS2 may have overstayed his constitutional welcome by waiting on the property, the mistake was minimal, at most. *See Punzo*, 208 F. App'x at 472 (holding that an occupant's consent to search a home following an illegal search of its basement was untainted where the basement sweep "took only a few minutes and turned up no contraband"). CS2 didn't use that time to gather any additional information. And Corder wasn't burdened by CS2's presence – he slept soundly all the while.

The encounter involved little or no coercion, too. This is not a case in which multiple officers broke down a door and entered with guns drawn. *See Robeles-Ortega*, 348 F.3d at 680–81. Officers did not arrive with surprise knock at the door in the dead of night. *See United States v. Jerez*, 108 F.3d 684, 690–91 (7th Cir. 1997). There was no yelling, and no physical contact with Corder. CS2 did not force his way into the basement residence. *See Wong Sun v. United States*, 371 U.S. 471, 474, 486 (1963).

CS2 didn't even enter the residence at all. He simply waited outside for a few minutes while Corder slumbered away. A brief, uninvited entry onto the curtilage to summon Corder is not flagrant. *See United States v. Alexander*, 573 F.3d 465, 478 (7th Cir. 2009) (finding that

illegal entry did not taint consent where police officers simply knocked on the door, defendant answered, and there was no "suggestion that they used force or violence to enter").

Moreover, CS2 was an acquaintance of Corder, and his entry was not entirely unexpected. CS2 reported that he had summoned Corder in the past by knocking on his window. CS2 had purchased drugs from Corder before. *See* Cplt., at ¶ 7 n.2 (Dckt. No. 1). In fact, only two weeks earlier, Corder had engaged in a prearranged drug transaction with CS2 on the street outside his residence. *Id.* at ¶¶ 7–12; *see also Seidman*, 156 F.3d at 549–50 (finding that conduct was not flagrant, even assuming an informant's entry into defendant's home was unlawful, where the defendant and informant had been friends for years and had discussed the possibility of meeting beforehand).

Corder argues that this factor weighs in favor of suppression because the "sole purpose of the FBI sending agent CS2 to defendants [sic] residence was for CS2 to . . . advance a drug investigation." *See* Mtn. to Suppress, at 21 (Dckt. No. 35, at 24 of 50). He cites *United States v. Conrad*, 578 F. Supp. 2d 1016, 1035–36 (N.D. Ill. 2008), to support this proposition, but the similarities between the police misconduct in that case and the case at hand are few. In *Conrad*, law enforcement illegally entered the defendant's curtilage *after* ringing the doorbell and phoning the residence on and off for two hours. They gave up on doing things the legal way and resorted to a Fourth Amendment violation to further the investigation and contact the defendant.

Here, in contrast, CS2 waited only several minutes before Corder answered his knocking. And more generally, the fact that CS2 went to Corder's home in the hope of obtaining evidence against him is not dispositive. *See McDaniel*, 847 F.3d at 897 (holding that officers' conduct was not flagrant or purposeful even though they "went to [petitioner's] house to investigate [a] death and hoped that their investigation would turn up evidence during questioning").

26

Law enforcement did not use the curtilage violation itself as "an investigatory method to discover evidence." *McDaniel*, 847 F.3d at 896. CS2 entered the curtilage to meet Corder at his window, not to search the curtilage itself. *See King*, 563 U.S. at 469 ("When law enforcement officers who are not armed with a warrant knock on a door, they do no more than any private citizen might do."); *Gutierrez*, 760 F.3d at 756 ("[I]t is unproblematic for law enforcement officers who are not armed with a warrant [to] knock on a door of a home, including for investigatory purposes . . . .") (cleaned up); *United States v. Hammett*, 236 F.3d 1054, 1059 (9th Cir. 2001) ("Law enforcement officers may encroach upon the curtilage of a home for the purpose of asking questions of the occupants.").

On this record, the Court cannot say that a seven-minute wait at the window "was a purposeful attempt to stretch the limits" of constitutionality. *See United States v. Carpenter*, 2023 WL 358794, at *9 (N.D. Ill. 2023). It was, at most, "an isolated instance of negligence that occurred in connection with a bona fide investigation of a suspected drug house." *Strieff*, 579 U.S. at 242.

In sum, the Court concludes that two of the three *Brown* factors tip decisively in favor of attenuation. CS2 may have stayed at Corder's window longer than an average visitor. But all things considered, the intrusion was minimal. It was not out of the ordinary for visitors to knock at Corder's window. And when Corder discovered CS2, he welcomed him to the property and walked him to the garage for the drug deal. Corder consented to the stay, and that consent was untainted by CS2 waiting several minutes at the window for Corder to wake up.

## Conclusion

For the foregoing reasons, Defendant's motion to suppress is denied.

Date:   March 16, 2023

_____

Steven C. Seeger
United States District Judge